51 CCPA

Tristram Allan TAYLOR, John James MacFarlane, Norman Stephenson and Power Jets (Research and Development) Limited, Appellants,

v.

Henry A. AMBROSE, Appellee.

Patent Appeal No. 7119.

United States Court of Customs and Patent Appeals.

June 11, 1964.

Roger L. Hansel, Washington, D. C., for appellants.

Meyer Neishloss, Pittsburgh, Pa. (Horace B. Cooke, Pittsburgh, Pa., of counsel), for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

SMITH, Judge.

This is an interference involving appellants' Patent No. 2,781,005 of February 12, 1957, issued upon application Serial No. 233,796, filed June 27, 1951, and appellee's application Serial No. 227,108, filed May 18, 1951. Appellants' application grew out of their British provisional specification No. 16,213 which was filed in Great Britain on June 28, 1950. Appellee copied ten claims from appellants' patent and those claims constitute the ten counts of this interference.

Appellee was the senior party upon declaration of the interference, on the basis of his May 1951 filing date. The Primary Examiner, however, granted appellants' motion to shift the burden of proof, holding that the counts were supported in appellants' earlier filed British provisional specification, and thus made appellants senior party. No testimony was taken and the interference went to a final hearing on the sole issue of whether appellants were entitled to an award of priority on the basis of their British specification. The Board of Patent Interferences, in its decision following the final hearing, held that appellants' British specification did not adequately support the counts and, accordingly, awarded priority to appellee.

Thus, the only question presented on the record in this case is whether appellants' British specification properly supports the counts in interference. We think that it does.

The invention of the counts relates to the problem of corrosion which occurs in gas turbine engines when low-grade residual fuel oils are burned. Such fuel oils often contain vanadium compounds

which, upon combustion of the oil, decompose to form vanadium pentoxide. Vanadium pentoxide has an extremely corrosive effect upon the turbine blades; indeed, such fuels cannot be safely used unless that effect is inhibited.

The parties claim to have solved the problem by employing an additive compound which will preferentially react with the vanadium impurities and form a stable, noncorrosive compound which will pass through the turbine blades without causing damage thereto. The additive may either be introduced directly into the combustion chamber along with the fuel, or mixed with the fuel prior to use in the turbine. The additives, as defined by the counts, may be selected from the group consisting of zinc and magnesium oxides, and zinc and magnesium compounds which will yield such oxides at temperatures in excess of 650°C. (which is the lower limit for the temperature of the hot combustion gases as specified in the counts).

Since all questions presented by this appeal apply equally to all of the counts, we need consider only a single representative count. Count 4 reads as follows:

> "4. In a gas turbine plant in which fuel oil containing vanadium and sulphur is burnt and which includes heat resisting metal parts exposed to the resultant stream of hot combustion gases at a temperature in excess of 650°C. and normally liable to be corroded by the vanadium pentoxide content of the ash resulting from combustion of said oil, the method of reducing said corrosion comprising the step of introducing into the plant upstream of said parts a compound yielding at temperatures in excess of 650°C. the oxide of a metal selected from the group consisting of magnesium and zinc, the quantity of said compound introduced being such that the molecular ratio of the minimum oxide content thereof to the vanadium pentoxide content of the ash is 3 to 1."

It should be noted that all of the counts specify that some sulfur be present in the fuel oil. This limitation arose during the course of prosecution of appellants' United States application. Appellants' British specification, filed in June 1950, substantially described the problem and the solution thereto which forms the subject matter of this interference. However, in addition to the zinc and magnesium compounds specified in the present counts, the British specification also disclosed *calcium* compounds for the same purpose. Appellants' United States application, filed within one year after the British specification, disclosed the same additive compounds as the British specification, including calcium; however, because of tests made during the interim period, the United States application included a specific reservation with respect to calcium compounds, thus:

> "Although from the above series of tests, it would appear that a calcium compound would be the most suitable additive from an economic point of view, it is found in practice that certain difficulties arise in the use of this element. Most residual fuel oils also contain a certain amount of sulphur and there is a tendency for the calcium to react with the sulphur to form calcium sulphate in preference to forming a vanadium compound. Hence calcium will only be suitable for use with sulphur free oils, or in cases where some means of removing the sulphur is used. It is found however that zinc and magnesium are not subject to this disadvantage, probably because their sulphates are unstable at the temperatures concerned."

In commenting on this reservation concerning the relative effectiveness of calcium compounds when used with sulfur-containing fuel oils, appellants' brief states:

> "Appellants, in their United States application, initially presented claims covering the three types of compounds, namely, calcium, zinc

and magnesium. During the course of prosecution, the Examiner cited a reference, namely ' "Symposium on Corrosion of Materials at Elevated Temperatures," Special Tech. Pub. No. 108 Pub. by American Society for Testing Materials—Presented June 26, 1950' (R–135 and R–201 to R–289), which disclosed calcium oxide as effective for the purpose of appellants' invention as claimed, and rejected those claims which included calcium in the Markush grouping under the doctrine of In re Borcherdt et al., 197 F.2d 550, 39 C.C. P.A. (Patents) 1045, which *at that time*, had not been overruled by this Honorable Court as was done in its decision in the case of In re Ruff et al., 256 F.2d 590, 45 C.C.P.A. (Patents) 1037. Appellants then modified their claiming of the invention by defining the residual fuel oils as sulfur-containing and by eliminating calcium compounds from the Markush group, pointing to that portion of the specification referred to above wherein the zinc and magnesium compounds were shown to be distinct from the calcium compounds. Thereupon, and substantially immediately, the claims as they appear in appellants' patent were allowed."

Thus, in appellants' United States application, a point of distinction was made as between zinc and magnesium compounds on the one hand and calcium compounds on the other, and this point of distinction was not made in appellants' British specification. Accordingly, the board took the view, and it is also appellee's position, that the British specification does not contain adequate disclosure to support the counts in issue, since it contains no information with respect to the sulfur limitation of the counts.

▪ Appellants urge that under our decision in In re Ruff, 256 F.2d 590, 45 CCPA 1037, it was unnecessary for them to include the sulfur limitation in the counts and that it would have been sufficient had they merely eliminated the cal-

cium compounds from the group of possible additives as was done. Thus, appellants argue, the sulfur limitation is not "critical" and the British specification need not contain such a disclosure. We need not, however, consider this argument, for we are of the opinion that the counts are fully and adequately supported by appellants' British specification, regardless of the "criticality" of the sulfur limitation.

The only limitations of the counts which have been urged by appellee as being absent from appellants' British specification are those concerning sulfur content and combustion gas temperature (greater than 650°C.). But, as the Primary Examiner found, in his decision on the motions and again in his decision on reconsideration, these two limitations are *inherently present* in the British specification. It is noted in this connection that the Board of Patent Interferences did not expressly overrule the examiner's findings on these points.

In appellants' arguments before the Primary Examiner and before the board, evidence was introduced which, we think, established the inherency of the said limitations in the British specification. This evidence showed that *all* low-grade residual fuel oils contain sulfur as an inherent impurity as they occur in nature. Commenting on this evidence in his decision on appellants' motion to shift the burden of proof, the Primary Examiner stated:

"* * * the British Provisional clearly recites that natural and low grade residual fuel oils 'are the fuels which the party Taylor et al desires to utilize.' 'Natural residual fuels' can only be construed to mean those residual products which remain as bottoms from the refining of petroleum crude oils. All such crude oils are known to contain at least a trace of sulphur. Texts such as Sachonen's The Chemical Constituents of Petroleum, page 365 (Reinhold Publishing Corporation, New York 1945) substantiate this view. Thus, it is inherent that residual fuel oils

will contain sulphur, because such impurities will remain in the residual fuel oil after the refining of the petroleum crude oil. The statement by party Taylor et al that 'practically all, if not, in fact all, petroleum oils contain sulfur' is not considered to be concession as to the lack of sulphur in residual fuel oils, inasmuch as this statement is not necessarily directed to 'natural residual fuels oils' as set forth in the British Provisional or to petroleum crude oils. Certainly, certain petroleum oils which have been highly refined may not contain sulphur, but these oils would not be considered as 'natural residual fuel oils'. Such residual fuel oil will necessarily contain at least traces of sulfur and the Examiner has found no authority to the contrary. Therefore, the limitation as to the sulphur content of residual oil is inherent in the fuel oil disclosed in the British Provisional Specification."

Accordingly, the limitation of the counts to sulfur-containing oils was held by the Primary Examiner to be satisfied by appellants' British provisional specification. We think the examiner was correct in so holding.

The evidence also showed that gas turbines operating on low-grade residual fuel oils customarily and normally operate at temperatures of 650°C. and above, and that the corrosion problem occurring in the use of such oils becomes a matter of concern at temperatures above about 650°C. In this regard the examiner commented:

"Although the question of operating temperatures was not presented in the party Ambrose brief, it was discussed at the hearing and party Ambrose contended that the temperature of 650°C was not disclosed in the Provisional Specification. It is true that the British Provisional does not mention specific operating temperatures, but the environment of the combustion process is recited as being within a gas turbine plant. The normal operating temperature of such plants is above 650°C, hence such temperatures are clearly disclosed or inherent in the operation recited by the British Provisional."

We are not inclined to disturb the examiner's findings as to these facts.

The board in its decision referred to the vanadium and sulfur limitations as giving "life" to the counts and stated:

"* * * To construe the counts as broadly as Taylor et al. now contend—that they are supported by the British provisional—would be a departure from the construction of the counts that was given when they were allowed over the prior art. Manifestly, this construction of the counts by the Examiner, and even by Taylor et al., for that matter, is wholly absent in the British provisional. To attempt to read these counts on the British provisional would render totally meaningless those limitations which give life to the counts."

We do not agree that the reference to sulphur in the counts is what gives them "life." Rather, it seems to us that the counts must stand or fall on the reference to vanadium and the method and materials for controlling corrosion caused thereby. This concept is what gives "life" to the counts, and we find it fully and adequately set forth in appellants' British provisional specification. As appellants correctly point out, patentability of a count to an applicant is not a matter which is ancillary to the issue of priority, e. g., Loukomsky v. Gerlich, 264 F.2d 907, 46 CCPA 805, and we therefore may not, in this case, consider questions relating to patentability, regardless of any contrary indications which may be implicit in the reasoning of the board.

For the foregoing reasons, the decision of the Board of Patent Interferences is reversed.

Reversed.